**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT ASSOCATION, Individually and On Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>APPHARVEST, INC. f/k/a NOVUS CAPITAL CORPORATION, JONATHAN WEBB, LOREN EGGLETON,<br><br>                              Defendants. | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Plymouth County Retirement Association ("Plaintiff"), individually and on behalf of all others similarly situated, by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by AppHarvest, Inc. f/k/a Novus Capital Corporation ("AppHarvest" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by AppHarvest; and (c) review of other publicly available information concerning AppHarvest.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired AppHarvest securities between October 9, 2020 and August 10, 2021, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     AppHarvest is a sustainable food company that operates applied technology greenhouses to produce fresh, chemical-free, non-GMO fruits, vegetables, and related products.

3.     On September 28, 2020, Novus and AppHarvest entered into an agreement for Novus and AppHarvest to merge via a reverse merger, with AppHarvest as the resulting public company.

4.     Upon the closing of the Merger, on January 29, 2021, Novus changed its name to "AppHarvest, Inc." Before the Merger, Novus common stock traded on the NASDAQ under the ticker NOVS. After the Merger, starting on February 1, 2021, AppHarvest common stock began trading on the NASDAQ under the ticker APPH.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose to investors that: (1) AppHarvest lacked sufficient training and management for its labor force; (2) as a result, the Company could not produce Grade No. 1 tomatoes consistently; (3) as a result, the Company's financial results would be adversely impacted; and (4) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      On August 11, 2021, before the market opened, AppHarvest announced its second quarter financial results, reporting a $32.0 million net loss.  The Company also lowered its full year sales guidance to a range of $7 million to $9 million, from a prior range of $20 million to $25 million.  AppHarvest attributed the lower-than-expected results to "operational headwinds with the ramp up to full production at the company's first CEA facility, including labor and productivity challenges related to the training and development of the new workforce and historically low market prices for tomatoes[.]"

7.      On this news, the Company's share price fell $3.46, or approximately 29%, to close at $8.51 per share on August 11, 2021, on unusually heavy trading volume.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, acquired AppHarvest common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant AppHarvest is incorporated under the laws of Delaware with its principal executive offices located in Morehead, Kentucky.  AppHarvest's common stock trades on the NASDAQ exchange under the ticker APPH.  AppHarvest was taken public through a reverse Merger with Novus.  Prior to the Merger, Novus traded on the NASDAQ under the ticker NOVS.  On February 1, 2021, AppHarvest's common stock began trading on the NASDAQ, with the price closing at $35.85 per share that day.

15.     Defendant Jonathan Webb ("Webb") was the Chief Executive Officer ("CEO") of AppHarvest at all relevant times.

16.     Defendant Loren Eggleton ("Eggleton") was the Chief Financial Officer of AppHarvest at all relevant times.

17.     Defendants Webb and Eggleton (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     AppHarvest is a sustainable food company that operates applied technology greenhouses to produce fresh, chemical-free, non-GMO fruits, vegetables, and related products.

19.     AppHarvest became a public company following a Merger with Novus that closed on or about January 29, 2021.  As a result of Merger, AppHarvest received about $475 million of gross proceeds.

20.     Novus was a "blank check" Delaware corporation that was formed for the purpose of entering into a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination with one or more businesses or entities.

21.    On September 28, 2020, Novus Capital Corporation, then a "blank check" company also known as a special purpose acquisition company ("SPAC"), entered into an agreement with private company, AppHarvest, Inc. ("Legacy AppHarvest") to effect a reverse merger between the entities (the "Merger").  As a result of the Merger, Novus acquired all of the issued and outstanding shares of Legacy AppHarvest, and Legacy AppHarvest became a wholly owned subsidiary of Novus.

22.    Upon the closing of the Merger, on January 29, 2021, Novus changed its name to AppHarvest, Inc.  Before the Merger, Novus common stock traded on the NASDAQ under the ticker NOVS.  After the Merger, starting on February 1, 2021, AppHarvest common stock traded on the NASDAQ under the ticker APPH.

23.    On September 29, 2020, AppHarvest issued a press release announcing its intention to become a public company through the Merger with Novus.  The press release stated the following regarding the Company and its capabilities, in pertinent part:

> AppHarvest is redefining American agriculture by developing modern, large-scale and efficient indoor farms in Central Appalachia, a water-rich region strategically located within a day's drive of approximately 70% of the U.S. population. AppHarvest has strong relationships with the leading agricultural and construction firms and universities in the Netherlands, the world's leader in high-tech controlled environment indoor farms.  The Netherlands, despite a land mass similar in size to Eastern Kentucky, is the world's second-largest agricultural exporter behind only the United States due to its extensive network of controlled environment agriculture facilities.  These relationships allow the Company to utilize the most recent proven technologies in an effort to sustainably increase crop yields, improve access to nutritious, non-GMO food, build a consistent and safe U.S.-grown food supply for national grocers, and increase investment in Appalachia.  The Company operates a 60-acre controlled environment agriculture facility in Morehead, KY — one of the largest high-tech greenhouses in the world — and has an active development pipeline for additional large-scale indoor controlled environment farm projects.
>
> Upon the closing of the transaction, AppHarvest will retain its highly experienced management, a team of growers with over 140 years of agricultural experience, including 120 years of sustainable agriculture experience, a sustainability team with more than 40 years of experience; and construction managers who have successfully managed over $19 billion in projects.

24.     On October 9, 2020, the Company filed a registration statement and preliminary proxy statement/prospectus on Form S-4 (the "Registration Statement") with the SEC, to effect the Merger.  The Registration Statement was amended on November 9, 2020, December 1, 2020, December 4, 2020, December 21, 2020, and, finally, January 7, 2021.  It was declared effective by the SEC on January 11, 2021.

25.     On February 1, 2021, the Company issued a press release announcing the completion of the Merger and the commencement of trading in AppHarvest common stock on the NASDAQ.

26.     Also on February 1, 2021, under the terms of the Merger, shareholders of Novus common stock had their stock converted into AppHarvest common stock.

### Materially False and Misleading
### Statements Issued During the Class Period

27.     The Class Period begins on October 9, 2020, the date the Registration Statement was first filed.

28.     The Registration Statement touted the Company's ability to enter and disrupt the U.S. produce market and to successfully produce controlled environment agriculture, and to do so quickly.

29.     For example, the Registration Statement stated, in pertinent part:

AppHarvest is building a large-scale, sustainable produce hub in Central Appalachia.   The Company is well-positioned to implement its sustainable infrastructure across the region with the key to success being the large-scale production operations.

. . .

AppHarvest is building some of the world's largest high-tech greenhouses, combining conventional agricultural techniques with today's technology to grow fruits and vegetables that are not genetically modified organisms and are free from chemical pesticides.  The Company's vision is to create America's AgTech capital from within Appalachia and provide better produce, better farming practices and better jobs.

6

. . .

Our Founder and Chief Executive Officer, Jonathan Webb, is a Kentucky native, and AppHarvest's employees have deep ties to this region, which has endured the rapid decline of its signature coal industry. AppHarvest chose its location intentionally to do its part in helping build a more inclusive, resilient economy. The Company's location in Eastern Kentucky also allows it to be within a day's drive of nearly 70% of the U.S. population, significantly reducing transportation costs compared to fruits and vegetables trucked cross-country from the southwestern United States and Mexico. This is expected to allow AppHarvest's produce to be cost-competitive, and, by harvesting closer to consumers, AppHarvest can minimize the need to treat its produce, a practice that can reduce nutritional value.

30.     The Registration Statement specifically touted the Company's infrastructure

stating, in pertinent part:

AppHarvest's first controlled environment agriculture facility, which spans more than 63 acres and is expected to provide approximately 45 million pounds of annual production capacity, is scheduled to open its first 30 acres of growing space in Morehead, Kentucky in October 2020, with the remainder opening in early 2021.

. . .

***Morehead Facility***

AppHarvest's controlled environment agriculture facility in Morehead, Kentucky, which [partially opened] in October 2020, is among the world's largest such facilities at 2.76 million square feet all under one roof. Revenue from the first harvest at the facility is expected in 2021. The farm includes cutting-edge technology . . . .

31.     Regarding its labor force, the Registration Statement stated, in pertinent part:

**Strong and available local labor force:** The Appalachian population exhibits faith and grit, as they seek to build a more resilient economy to move forward following the precipitous decline of the coal industry. Nearly 32% of Appalachian workers ages 16 and older commute to work in a county other than that in which they live, higher than the 28% rate nationally. That willingness to drive long distances for work comes as coal industry employment has fallen in Central Appalachia. In Kentucky, for instance, direct coal industry employment fell from 17,115 in 2010 to 6,521 in the first quarter of 2019. In Morehead, Kentucky, where AppHarvest's first controlled environment agriculture facility is located, the U.S. Census Bureau estimates that 24% of residents live in poverty, nearly double the national average.

32.     The Registration Statement also stated, in pertinent part:

AppHarvest has rapidly hired in the region as it prepares to open its first
controlled environment agriculture facility and benefited from a strong network of
employer assistance programs ready to help companies interested in locating in
the region to provide jobs for its ready workforce.

33.     The Registration Statement also touted the Company's relationship with key
distribution partner Mastronardi Produce Limited, with which the Company had an agreement
for it to be the sole and exclusive distributor of all products out of the first AppHarvest facility.
The Registration Statement stated, in pertinent part, that the Company was "well-positioned to
grow its brand with consumers through its distribution partner which provides AppHarvest with
full distribution on day one of production, allowing customers to experience AppHarvest's
products and grow customer recognition and loyalty."

34.     The Registration Statement also stated the following, regarding Mastronardi:

***Mastronardi is currently AppHarvest's sole, exclusive marketing and
distribution partner.  We are highly dependent on this relationship, and
impairment to or termination of this relationship could adversely affect our
results of operations and financial condition.***

Mastronardi is AppHarvest's exclusive marketing and distribution partner for all
Products pursuant to the Purchase and Marketing Agreement between
AppHarvest and Mastronardi dated as of March 28, 2019 (the "Mastronardi
Agreement").  Under the terms of the Mastronardi Agreement, AppHarvest is
responsible for growing, producing, packing and delivering all Products to
Mastronardi, and Mastronardi is responsible for marketing, branding and
distributing the Products to its customers.  Mastronardi will sell the Products at
market prices that are consistent with the best and highest prices available during
the duration of the applicable growing season for like kind USDA Grade No. 1
products. Mastronardi will set the market price for the Products and will pay over
to AppHarvest the gross sale price of the Product sold by Mastronardi, less a
marketing fee and Mastronardi's costs incurred in the sale and distribution of the
Product.

Mastronardi is only obligated to purchase AppHarvest's products that are at or
above USDA Grade No. 1 standards and export quality standards within North
America and of a quality required by Mastronardi's customers, in Mastronardi's
sole determination.  The Mastronardi Agreement provides for an inspection
period during which Mastronardi will inspect AppHarvest's produce to determine
whether it meets the required quality standards, and Mastronardi may reject and
return any of AppHarvest's products that do not meet these standards.  Any

significant or unexpected rejection of AppHarvest's products could negatively impact AppHarvest's results of operations, and AppHarvest may be unable to sell the rejected products to other third parties.  Further, because Mastronardi acts as an intermediary between AppHarvest and the retail grocers or foodservice providers, AppHarvest does not have short-term or long-term commitments or minimum purchase volumes with them that ensure future sales of its products.

[Emphasis in original.]

35.     On October 21, 2020, AppHarvest announced that it had opened its first agriculture facility in Morehead, Kentucky.  AppHarvest issued a press release that day entitled, "AppHarvest Opens One of the World's Largest High-Tech Greenhouses in Appalachia to Redefine American Agriculture."  The press release stated, in pertinent part:

The company and its mission represent a stark change to the existing American food system, which is increasingly reliant on imports.  AppHarvest's first harvest of tomatoes is expected to be available in early 2021 at leading grocers and restaurants.  Tomatoes are AppHarvest's first crop as more than 60% of America's fresh tomatoes were imported in 2019, an increase of almost 50% over the past decade.

Today's opening follows an announcement yesterday that AppHarvest has already broken ground on a second controlled environment agriculture facility.  Located in nearby Richmond, KY, the facility will be comparable in size to the company's flagship operation in Morehead, KY.

AppHarvest, which is both a legal public benefit corporation and certified B Corp, expects to create more than 300 jobs at its Morehead farm in Appalachia, which has long trailed national employment trends due to the decline of the coal industry.  In just over two years, AppHarvest attracted more than $150 million in investment into the region . . . .

"It's far past time for American agriculture to change," said AppHarvest Founder & CEO Jonathan Webb.  "The pandemic has revealed just how fragile our food system is, and we're working at the forefront of changing so much that's wrong with the status quo."

36.     On November 19, 2020, AppHarvest issued a press release entitled, "AppHarvest Plants First Tomato Crop with Harvest Expected in Grocery Stores Early Next Year," announcing it "planted its initial crop of tomatoes in October 2020 and expects to begin recognizing revenues no later than the first quarter of 2021."

37.     On January 11, 2021, the Company filed a proxy statement/prospectus for the purpose of soliciting approval of the Merger at a shareholder meeting to be held on January 29, 2021.  The proxy statement/prospectus, which forms a part of the Registration Statement, made substantially similar statements as the Registration Statement.

38.     On January 19, 2021, the Company issued a press release entitled, "AppHarvest Announces First Harvest of Tomatoes at Flagship High-Tech Indoor Farm Shipping to Grocery Stores" ("the January 19 Release").   The release announced that the Company's "first-ever harvest — Beefsteak tomatoes from its 60-acre Morehead, Kentucky, flagship indoor farm — will start to roll out in grocery stores this week[,]" including "national retailers such as Kroger, Publix, Walmart, Food City and Meijer."

39.     The January 19 Release also stated, in pertinent part:

At ramp-up, AppHarvest's Morehead facility alone is expected to produce about 45 million pounds of tomatoes annually from about 720,000 tomato plants, a mix of Beefsteak and "Tomatoes on the Vine."  AppHarvest has two more facilities under construction — a similar 60-plus acre facility outside Richmond, Ky., and a 15-acre facility to grow leafy greens in Berea, Ky.  AppHarvest also is planning for more facilities across Kentucky and Central Appalachia, with the goal of 12 total farms by the end of 2025.

40.     On February 25, 2021, AppHarvest issued a press release announcing its full-year 2020 financial results.  In the release, the Company stated,

AppHarvest utilizes technology that continuously analyzes data from sophisticated digital monitoring systems composed of more than 300 sensors to analyze micro-climates to optimize growth with tomato plants reaching upwards of 40-feet tall and ***the first farm alone is expected to produce over 40 million pounds of tomatoes annually***.

. . .

**First Quarter 2021 Outlook and Fiscal Year 2021 Forecast**

The Company currently expects the following results for its first quarter ended March 31, 2021:

Net revenue to be in the range of $2.1 million to $2.6 million

Adjusted EBITDA loss to be in the range of $14 million to $16 million

The Company currently expects the following results for its fiscal year ending December 31, 2021:

Net revenue to be in the range of $20 million to $25 million

Adjusted EBITDA loss to be in the range of $43 million to $45 million

. . .

"***Our favorable crop yields and market pricing currently support a 2021 sales outlook that is better than we expected in December 2020***," said AppHarvest Founder & Chief Executive Officer Jonathan Webb.   "In January 2021, we delivered our first harvest of tomatoes from our flagship 63-acre indoor farm and began shipping to select national grocery retailers.   We remain focused on our mission to build a resilient domestic food system for the U.S. to support this outlook in our first year as a public company."

***In addition to better than anticipated crop yields and pricing***, the Company has benefited from a temporary decline in market supply related to recent extreme winter weather conditions that prevented transport of produce through Texas from Mexico and that resulted in significant amounts of food waste.   Part of AppHarvest's mission is to create a climate-resilient domestic food system for the U.S. to prevent such supply chain disruptions.

[Emphasis added.]

41.     On May 17, 2021, AppHarvest announced its first quarter 2021 financial results in a press release that stated, in relevant part:

**First Quarter 2021 Highlights**

- $2.3 million net sales in first quarter harvesting, meeting expectations

- 3.8 million pounds of tomatoes sold

- $4.5 million gross loss driven by launch of commercial operations, sales and training new labor force

- $28.5 million net loss compared to $0.8 million in the prior year period in 2020

- $12.4 million adjusted EBITDA loss compared to initial expectation of loss of $14.0 million to $16.0 million amid rapid scaling of the business

- $297.7 million cash and cash equivalents at the end of Q1

**Results**

AppHarvest, which started trading on Nasdaq on February 1, **generated $2.3 million in net sales in the first quarter 2021 as it began harvesting from its initial high-tech indoor farm in Morehead, Ky., representing 3.8 million pounds sold with the farm only partially planted as the facility ramped up**.

"At our flagship farm in Morehead, Ky., our expert growers have ramped up production of the full 60 acres as of the first week of May," said AppHarvest Founder and CEO Jonathan Webb. "The team is putting in place the right infrastructure for growth, taking employment from around 20 a year ago to 500 by the end of the first quarter. We plan to move ahead on two more projects this summer which will put us at five operating farms by the end of 2022, and we are well on track for 12 farms by the end of 2025."

[Emphasis added.]

42.     The same day, the Company held a conference call to discuss its financial results with analysts and investors. During the call, Defendant Eggleton stated:

In terms of the actual yield for the first quarter, we were pleased that our Morehead facility generated a total of 3.8 million pounds of tomatoes sold. This includes a mix of beefsteak and TOV tomatoes as well as varying levels of quality for each.

\* \* \*

The blended price per pound we realized during the first quarter, which you can generally calculate from our financials by dividing net sales by the pounds sold, reflects the mix of varying grades of tomatoes. With Grade No. 1 selling at a premium and the price fluctuating by season and over time due to market conditions. It also reflects product mix though in Q1 substantially all of our pounds sold were beefsteak tomatoes. **This being our first harvest of our new facility, we expect our grade mix to migrate upward over the coming quarters as we fine tune our farm operations and implement additional technology and data analytics into our processes.**

[Emphasis added.]

43.     During the same call, Defendant Webb touted that "[i]t's important that a tomato is not a tomato is not a tomato, and for the AppHarvest tomato, Mastronardi produce has made it abundantly clear that they can deliver and put on store shelves every tomato and fruit and vegetable we grow."

44.     Also on May 17, 2021, AppHarvest filed its quarterly report on Form 10-Q for the period ended March 31, 2021, which repeated many of the misstatements made in the Registration Statement.

45.     The above statements identified in ¶¶30-46 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose to investors: (1) that AppHarvest lacked sufficient training and management for its labor force; (2) that, as a result, the Company could not produce Grade No. 1 tomatoes consistently; (3) that, as a result, the Company's financial results would be adversely impacted; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

46.     On August 11, 2021, before the market opened, AppHarvest announced its second quarter 2021 financial results, reporting a $32.0 million net loss.   The Company also lowered its full year sales guidance to a range of $7 million to $9 million, from a prior range of $20 million to $25 million.   AppHarvest attributed the lower-than-expected results to "operational headwinds with the full ramp up to full production at the company's first CEA facility, including labor and productivity challenges related to the training and development of the new workforce and historically low market prices for tomatoes."   Specifically, the Company's press release stated:

> For the second quarter of 2021, net sales were $3.1 million, an increase of $0.8 million from the first quarter of 2021, when AppHarvest began its inaugural harvest and launched as a public company.   AppHarvest sold 8.6 million pounds of tomatoes in the second quarter, an increase of 4.8 million pounds from the first quarter.
>
> The company recorded a net loss of $32.0 million and non-GAAP Adjusted EBITDA loss of $22.6 million in the second quarter of 2021, as compared to a net loss and non-GAAP Adjusted EBITDA loss of $1.6 million in the second quarter of 2020, when the company was still pre-production.   *See* reconciliation of the

non-GAAP measure at the end of this press release. ***Second quarter 2021 results were adversely impacted by operational headwinds with the ramp up to full production at the company's first CEA facility, including labor and productivity challenges related to the training and development of the new workforce and historically low market prices for tomatoes during the second quarter of 2021 based on USDA reports. Labor and productivity challenges resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher distribution and shipping fees.***

\* \* \*

**Financial Outlook**

***The company adjusted its full-year 2021 net sales outlook to the range of $7 million to $9 million from a prior range of $20 million to $25 million. This reflects aforementioned operational headwinds associated with the full ramp up of the Morehead farm and moderated produce market price expectations and a strategic decision to broaden its business model by investing in farm operations technology, operational best practices and value-added products.*** The company also updated its full-year 2021 outlook for Adjusted EBITDA to the loss of $70 million to $75 million from a prior range of a loss of $48 million to $52 by operational challenges encountered in the abbreviated initial growing season and the decision to dedicate a portion of the farm to the noted strategic investments.

[Emphasis added.]

47.    On this news, the Company's share price fell $3.46, or approximately 29%, to close at $8.51 per share on August 11, 2021, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

48.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired AppHarvest securities between October 9, 2020 and August 10, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, AppHarvest's shares actively traded on the NASDAQ.   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.   Tens of millions of AppHarvest shares were traded publicly during the Class Period on the NASDAQ and the Company had 100,253,268 shares of common stock issued and outstanding as of May 21, 2021.   Record owners and other members of the Class may be identified from records maintained by AppHarvest or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of AppHarvest; and

(c)       to what extent the members of the Class have sustained damages and the proper measure of damages.

53.       A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

54.       The market for AppHarvest's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, AppHarvest's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired AppHarvest's securities relying upon the integrity of the market price of the Company's securities and market information relating to AppHarvest, and have been damaged thereby.

55.       During the Class Period, Defendants materially misled the investing public, thereby inflating the price of AppHarvest's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about AppHarvest's business, operations, and prospects as alleged herein.

56.       At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about AppHarvest's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

57.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

58.     During the Class Period, Plaintiff and the Class purchased AppHarvest's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

59.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding AppHarvest, their control over, and/or receipt and/or modification of AppHarvest's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning AppHarvest, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

60.     The market for AppHarvest's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, AppHarvest's securities traded at artificially inflated prices during the Class Period. Members of the Class have suffered damages in that, in reliance on the integrity of market, they paid artificially inflated prices for AppHarvest securities.

61.     During the Class Period, the artificial inflation of AppHarvest's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about AppHarvest's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of AppHarvest and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

62.     At all relevant times, the market for AppHarvest's securities was an efficient market for the following reasons, among others:

(a)     AppHarvest shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, AppHarvest filed periodic public reports with the SEC and/or the NASDAQ;

(c)     AppHarvest regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or,

(d)     AppHarvest was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

63.     As a result of the foregoing, the market for AppHarvest's securities promptly digested current information regarding AppHarvest from all publicly available sources and reflected such information in AppHarvest's share price.   Under these circumstances, all purchasers of AppHarvest's securities during the Class Period suffered similar injury through their purchase of AppHarvest's securities at artificially inflated prices and a presumption of reliance applies.

64.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material

misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

65.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of AppHarvest who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

66.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase AppHarvest's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth.

68.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to AppHarvest's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

69.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about AppHarvest's financial well-being and prospects, as specified herein.

70.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of AppHarvest's value and

performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about AppHarvest and its business operations and future prospects in light of the circumstances under which they were made, not as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

71.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

72.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing AppHarvest's financial well-being and prospects from

the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

73.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of AppHarvest's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired AppHarvest's securities during the Class Period at artificially high prices and were damaged thereby.

74.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that AppHarvest was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their AppHarvest securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

75.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

77.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

78.     Individual Defendants acted as controlling persons of AppHarvest within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

79.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the

particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

80.     As set forth above, AppHarvest and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgement, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  November 22, 2021          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

  s/ *Thomas L. Laughlin, IV*
Thomas L. Laughlin, IV (TL-8888)
Rhiana L. Swartz
The Helmsley Building
230 Park Avenue, 17th Floor
New York, New York 10169
Telephone: (212) 223-6444

Facsimile:  (212) 223-6334
tlaughlin@scott-scott.com
rswartz@scott-scott.com

*Counsel for Plaintiff Plymouth County Retirement Association*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

s/ *Thomas L. Laughlin, IV*
Thomas L. Laughlin, IV